UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ADEPTUS HEALTH INC., THOMAS S. HALL, TIMOTHY L. FIELDING, RICHARD COVERT, DANIEL W. ROSENBERG, GREGORY W. SCOTT, RONALD L. TAYLOR, JEFFERY S. VENDER, STEVEN V. NAPOLITANO, STEPHEN M. MENGERT, STERLING PARTNERS, GOLDMAN, SACHS & CO., AND MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 6:15-cv-1243 |

**COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS**

Plaintiff Oklahoma Law Enforcement Retirement System ("Plaintiff") makes the following allegations based upon the investigation of Plaintiff's counsel, which includes a review of United States Securities and Exchange Commission ("SEC") filings by Adeptus Health Inc. ("Adeptus Health" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons who purchased the Class A common shares (hereinafter the "common shares" or "common stock") of Adeptus Health pursuant to the Company's secondary public offering (the "SPO") on or about July 31, 2015 seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), as well as on behalf of the purchasers of the Company's common shares between April 23, 2015 and November 16, 2015, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

4.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District.

5.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

6.     Plaintiff purchased Adeptus Health common shares, as set forth in the certification attached hereto and incorporated herein by reference, and was damaged thereby.

7.     Defendant Adeptus Health owns and operates a network of independent freestanding emergency rooms in the United States.  The Company maintains its principal executive offices in Lewisville, Texas.

8.     Defendant Thomas S. Hall ("Hall") served, at all relevant times, as Chairman of Board, President, Chief Executive Officer ("CEO") and a Director of Adeptus Health.   On September 7, 2016, the Company issued a press release announcing defendant Hall's intention to "retire" as CEO of Adeptus Health.

9.     Defendant Timothy L. Fielding ("Fielding") served, at all relevant times, as Treasurer, Chief Financial Officer ("CFO") and Principal Financial and Accounting Officer of Adeptus Health.

10.     Defendants Richard Covert ("Covert"), Daniel W. Rosenberg ("Rosenberg"), Gregory W. Scott ("Scott"), Ronald L. Taylor ("Taylor"), Jeffery S. Vender ("Vender"), Steven V. Napolitano ("Napolitano") and Stephen M. Mengert ("Mengert") each served as members of Adeptus Health's Board of Directors at the time of the SPO.

11.     Defendants Hall, Fielding, Covert, Rosenberg, Scott, Taylor, Vender, Napolitano and Mengert are collectively referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement (defined below) issued in connection with the SPO.

12.     Defendant Sterling Partners ("Sterling Partners") is a private equity firm based in Chicago, Illinois.  According to the Company's filings with the SEC, Sterling Partners is the "Sponsor" of Adeptus Health, and defendant Rosenberg, a Company Director, has been a Managing Director of Sterling Partners since 2006.

13.     Defendants Goldman, Sachs & Co. ("Goldman Sachs") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") each served as joint book-running underwriters for the SPO.  The underwriters for the SPO collectively received discounts and commissions of approximately $17.5 million in connection therewith.

14.     Defendants Goldman Sachs and Merrill Lynch are collectively referred to herein as the "Underwriter Defendants."  The Underwriter Defendants participated in the drafting and dissemination of the registration statement for the SPO.  The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the registration statement for the SPO was prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

15.     Unless otherwise noted, defendant Adeptus Health, the Individual Defendants, defendant Sterling Partners and the Underwriter Defendants are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all persons other than Defendants who

purchased the common stock of Adeptus Health in the SPO on or about July 31, 2015, as well as purchasers of the Company's common shares between April 23, 2015 and November 16, 2015, inclusive (the "Class").

17.     Excluded from the Class are Defendants, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

18.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, between 10 million and 14 million Adeptus Health common shares were outstanding.  The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Adeptus Health, its transfer agent or the Underwriter Defendants.  Notice can be provided to such record owners by a combination of published notices and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

19.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

20.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

21.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the registration statement issued in connection with the SPO omitted and/or misrepresented material facts about the Company and its business;

(c)     whether certain statements made by defendants Adeptus Health, Hall, and Fielding to the investing public during the Class Period were materially false and misleading;

(d)     whether the price of Adeptus Health stock was artificially inflated during the Class Period; and

(e)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Company

23.     Defendant Adeptus Health describes itself as a patient-centered healthcare organization that provides emergency medical care through, what it claims to be, the largest network of independent freestanding emergency rooms ("FSER") in the United States.

24.     In 2002, the Company's predecessor, First Choice ER, LLC ("First Choice") was founded as a provider of community-based, emergency care facilities.  In 2003, defendant Covert, a Director and the current Vice-Chairman of the Board of Adeptus Health, joined First Choice and eventually became its CEO.

25.     Adeptus Health has since expanded its operations and owns and operates hospitals and freestanding facilities in partnership with Texas Health Resources in Texas, UCHealth in Colorado, and Dignity Health in Arizona.  In addition, the Company has entered into development partnership agreements with the New Orleans-based Ochsner Health System and the Mount Carmel Health System in Ohio.  As of June 30, 2016, Adeptus Health owns and/or operates 93 freestanding facilities and two fully licensed general hospitals located in the Houston, Dallas/Fort Worth, San Antonio, Austin, Colorado Springs, Denver and Phoenix markets.

26.     In 2011, funds affiliated with Sterling Partners acquired a 75% interest in First Choice.  Following Sterling Partners' investment in First Choice in 2013, Adeptus Health LLC was created to own and operate First Choice emergency rooms.

27.     Thereafter, Adeptus Health was formed for the purpose of conducting an initial public offering and is the holding company of its sole material asset, a controlling equity interest in Adeptus Health LLC.

28.     On June 30, 2014, Adeptus Health completed its initial public offering (the "IPO") of 5.3 million common shares and received net proceeds of approximately $96.2 million.  Sterling Partners, which Adeptus Health refers to as its "Sponsor," also sold 313,586 common shares in the IPO.

29.     On May 11, 2015, Adeptus Health completed a secondary public stock offering (the "May 2015 offering") of 1.6 million common shares.  At the time of the May 2015 offering, Adeptus Health operated approximately 70 FSERs.  Adeptus Health received net proceeds of approximately

$94.5 million in the May 2015 offering, and Sterling Partners sold 842,704 shares of its Adeptus Health stock which represented approximately 20% of its holdings.

30.     On July 31, 2015, Adeptus Health completed the SPO selling 2.645 million common shares and receiving net proceeds of approximately $265.9 million.   Sterling Partners, the Company's Sponsor and largest beneficial owner of Adeptus Health common shares at the time of the SPO, sold 1.265 million common shares in the SPO for net proceeds of approximately $127.2 million.

**Adeptus Health's Business Model**

31.     In March 2010, President Barrack Obama signed the Patient Protection and Affordable Care Act into law, as amended by the Health Care and Education Affordability Reconciliation Act of 2010, or PPACA.  In addition to making major changes in how healthcare is delivered and reimbursed, the PPACA has increased the U.S. population's access to health insurance benefits.

32.     As a result, the number of people with health insurance benefits in the U.S. is expected to increase significantly.  This influx of newly insured patients is expected to create market opportunities for medical providers, including providers of emergency care such as Adeptus Health.

33.     According to Adeptus Health, FSER are the least penetrated alternate site provider segment in the U.S. healthcare sector.  The Company believes its business model for establishing new FSER is highly scalable and presents it with a significant opportunity to capitalize on an underpenetrated market.  Thus, the Company believes it has significant growth potential in both new and its existing markets.

34.     Adeptus Health obtains patient service revenues by collecting fees from patients, insurance companies, and other third-party payors for the professional and technical services

provided at its facilities.  These fees include a "facility fee," a "professional services fee" and "other related fees."

35.     Adeptus Health receives payment for its services from its patients and insurance companies, which it sometimes refers to as commercial third-party payors.  During the years ended December 31, 2015 and 2014, four major third-party commercial payors accounted for approximately 85% of the Adeptus Health's patient service revenue.  The balance of the Company's patient service revenue was derived primarily from other, smaller third-party commercial payors, self-pay patients and workers' compensation insurance.

36.     During the Class Period, Adeptus Health did not bill Medicare or Medicaid for the services it rendered.

37.     According to the Company, it "operate[s] at the higher end of the acuity and emergency care spectrum" and derives higher revenue from more complex treatments, in part, because reimbursement rates set by third-party payors tend to be higher for higher acuity visits.

38.     The Agency for Healthcare Research and Quality has published an Emergency Severity Index ("ESI") handbook that serves as a resource to help standardize the prioritization of incoming emergency room ("ER") patients in the United States.  The ESI handbook is designed to help ERs implement a program that can identify patients in need of immediate attention and those that may be better served by an urgent-care facility.  The ESI handbook standardizes ER patient triage via an algorithm that stratifies patients within a five-level acuity scale, with level one assigned to those patients indicating the greatest urgency.  This triage acuity scale is illustrated in the following chart:

| Level | Name | Description | Examples |
|-------|------|-------------|----------|
| 1 | Resuscitation | Immediate, life-saving intervention required without delay | Cardiac arrest Massive bleeding |
| 2 | Emergent | High risk of deterioration, or signs of a time-critical problem | Cardiac-related chest pain Asthma attack |
| 3 | Urgent | Stable, with multiple types of resources needed to investigate or treat (such as lab tests plus X-ray imaging) | Abdominal pain High fever with cough |
| 4 | Less Urgent | Stable, with only one type of resource anticipated (such as only an X-ray, or only sutures) | Simple laceration Pain on urination |
| 5 | Nonurgent | Stable, with no resources anticipated except oral or topical medications, or prescriptions | Rash Prescription refill |

39.     The ESI handbook explains that, while the ESI algorithm can guide a health care professional in asking appropriate questions of an incoming ER patient and the type of information to be gathered, triage acuity ratings with respect to patients in need of care are, in large part, subjective and dependent upon a health care provider's professional judgment.

40.     Adeptus Health's operations are impacted by various laws and regulations, including certain state laws that prohibit general business corporations from practicing medicine or controlling physicians' medical decisions.   As a result of these state laws, during the Class Period, the Company's physicians were contracted through the following affiliated professional limited liability companies: (i) in Texas, the National Medical Professionals of Texas PLLC; (ii) in Colorado, the National Medical Professionals of Colorado PLLC; and (iii) in Arizona, the National Medical Professionals of Arizona LLC.  These professional limited liability companies are owned by James Muzzarelli, the Executive Medical Director of Adeptus Health.

**Adeptus Health Engages in Predatory Overbilling Practices**

41.     On November 17, 2015, KUSA, an NBC-affiliated television station located in Denver, Colorado, aired an investigative report related to billing practices occurring at the Company's First Choice ER locations in Colorado.  The KUSA report, which was represented to

have been based on "months" of investigation, found that the Company's First Choice ERs engaged in a pattern and practice of predatory overbilling.

42.    For example, Jennifer Martin, who visited a First Choice ER for shortness of breath, stated "they sent me home and told me I needed to relax."  Two weeks later, Ms. Martin received a bill totaling $6,237.  Jeff Nixon, a deck builder complained that he was billed $3,690 to have a splinter removed from his thumb.  Doug Linder, who walked into a UCHealth ER in August 2015 with a cut finger, complained that he was charged over $3,000 for a few stiches.  "We had no idea we were going to get slammed with this [bill]," his wife Teresa said.  "Honestly, it just sucks."

43.    The magnitude of Adeptus Health's overbilling practices are demonstrated by the trend in the Company's revenue per patient visit, which increased by more than **50%** over a four year period:



44.    As noted in Adeptus Health's filings with the SEC, increasing patient volumes is a "key revenue driver" and a basis upon which the Company forecasts its expected net revenue. However, as illustrated in the chart below, the rate of growth in Adeptus Health's *same-store revenue* has ballooned, even though its *same-store patient volumes* have been a steady rate of *decline*, further demonstrating the magnitude of the Company's overbilling practices:



45.     According to the Company's SEC filings, same-store financial data measures the period‑over‑period change in facilities that have been open for 15 months or more.

46.     Indeed, the Company's widespread overbilling practices has subjected it to numerous undisclosed risks, including monetary risks and reputational risks, particularly because Adeptus Health is subject to comprehensive and complex laws and rules that govern the manner in which it may bill and be paid for services by third-party payors.  The failure to comply with such rules can result in civil or criminal sanctions and can even result in its exclusion from federal and state healthcare programs.

### The Registration Statement for the SPO Contained Inaccurate Statements of Material Fact and Omitted Material Information Required to Be Disclosed Therein

47.     On July 20, 2015, Adeptus Health filed with the SEC a Form S-3 shelf registration statement (the "Form S-3") pursuant to which the Company and its selling stockholders  may, from time to time, offer and/or sell Adeptus Health common shares in one or more offerings or resales.

48.     On July 31, 2015, Adeptus Health filed with the SEC a prospectus (the "Prospectus") for the SPO that offered to register for sale 3,910,000 common shares (including 510,000 common shares pursuant to an overallotment option issued to the Underwriter Defendants) owned by the Company and Sterling Partners at a price of $105.00 per share.

49.     The Company sold 2,645,277 common shares to the public in the SPO and received net proceeds of approximately $265.9 million therefrom.  In addition, Sterling Partners, the largest beneficial owner of Adeptus Health common shares at the time of the SPO, sold more than 38% of its common share holdings in Adeptus Health to the public in the SPO for net proceeds of approximately $127.2 million.

50.     The SPO was sold pursuant to the Form S-3 and the Prospectus (jointly referred to herein as the "Registration Statement") that contained inaccurate statements of material fact and omitted material information required pursuant to the regulations governing its preparation.

51.     The Registration Statement included materially inaccurate statements that positively highlighted patient satisfaction.  The Registration Statement stated, in pertinent part, as follows:

> We also believe that we offer a dramatically improved patient experience relative to traditional hospital emergency departments by significantly reducing wait times and providing rapid access to Board-certified physicians on-site.  We also provide convenient access to critical, high-acuity care as compared with urgent care centers and are open 24 hours a day, seven days a week.  Based on patient feedback collected by Press Ganey, First Choice Emergency Room received the prestigious Guardian of Excellence Award in 2013 and 2014 for **exceeding the 95th percentile in patient satisfaction nationwide**.

> *       *       *

> ***Value Proposition for Patients***

> As healthcare has evolved, the consumer has taken greater control of healthcare expenditures and demands more convenient access to healthcare, better value and an improved overall patient experience.  Our philosophy is to center care around the patient, rather than expect the patient to adapt to our facilities and staff.  We offer patients an attractive value proposition:

> - ***Access to Care***.  Our facilities are located in a convenient, local community setting and are open 24 hours a day, seven days a week with on-site emergency staff, including a Board-certified physician at all times.

> - ***Immediate Care***.  A streamlined check-in process designed to have patients seen by a physician within minutes.

> - ***Physician Focus***.  Our physicians are focused on the patient, spending more time on patient care than on administrative tasks, providing high-quality service, prompt diagnoses and the appropriate medical treatment.

> - ***Technology***.  Facilities equipped with full radiology suites, including CT scanners, digital x-rays and ultrasounds, as well as on-site laboratories

certified by CLIA and accredited by COLA that provide test results within approximately 20 minutes.

- *Superior Experience*.  An overall enhanced patient experience.

**As a result, based on patient feedback collected by Press Ganey, First Choice Emergency Room received the prestigious Guardian of Excellence Award in 2013 and 2014 for exceeding the 95th percentile in patient satisfaction nationwide**.

\*       \*       \*

### Superior Patient Experience

We strive to consistently offer a superior patient experience through both our medical staff and facility capabilities.  Our emergency rooms are staffed with Board-certified physicians and emergency-trained registered nurses capable of handling all emergency room issues with a physician on-site at all times.  Each of our facilities is equipped with a full radiology suite, including CT scanners, digital x-ray and ultrasound, as well as on-site laboratories certified by CLIA and accredited by COLA.  Our patients are typically face-to-face with a medical professional within minutes of arrival, and our patient satisfaction ratings exceed the vast majority of hospital emergency rooms nationally**.  Based on patient feedback collected by Press Ganey, we exceeded the 95th percentile in the nation for patient satisfaction and received the Guardian of Excellence Award in 2013 and 2014, the highest award bestowed by the organization**.[1]

52.     The statements referenced above were materially inaccurate because they did not disclose the Company's on-going excessive billing practices that were generating a large volume of patient complaints.

53.     In addition, the Registration Statement incorporated by reference the Company's Form 10-K for the fiscal year ended December 31, 2014 (the "2014 Form 10-K") and Form 10-Q for the three months ended March 31, 2015 (the "Q1 2015 Form 10-Q).  The Registration Statement inaccurately represented that the financial statements included in the 2014 Form 10-K and Q1 2015 Form 10-Q were presented in accordance generally accepted accounting principles ("GAAP").

54.     The representation that Adeptus Health's financial statements were prepared in accordance with GAAP was materially false and misleading because such financial statements failed to disclose significant risks and loss contingencies associated with overbilling practices in

---

[1]     All emphasis is added unless otherwise noted.

conformity with GAAP's Accounting Standards Codification Topic No. 275, *Risks and Uncertainties* and Topic No. 450, *Contingencies*. Indeed, the Company's overbilling practices subjected it to numerous undisclosed risks, including the reversal of improperly recorded revenue, understated provisions for uncollectible accounts, monetary fines, civil or criminal sanctions, and even exclusion from federal and state healthcare programs.

55.     Compliance with GAAP is a basic fundamental obligation of publicly traded companies. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

56.     In addition, the Registration Statement included materially inaccurate risk related statements and failed to disclose significant known, existing risks that caused the SPO to be speculative or risky. Item 3 of Form S-3 required the Registration Statement to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. §229.503], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."

57.     For example, the 2014 Form 10-K incorporated by reference in the Registration Statement stated, in pertinent part, as follows:

> ***We depend on payments from a variety of third-party payors.  If these payments are significantly delayed, are reduced or eliminated, our revenue and profitability could decrease***.
>
> We depend upon compensation from third-party payors for the services provided to patients in our facilities.  The amount that our facilities receive in payment for their services may be adversely affected by factors we do not control, including state regulatory changes, cost-containment decisions and changes in reimbursement schedules of third-party payors and legislative changes.  Any reduction or elimination of these payments could have a material adverse effect on our business, prospects, results of operations and financial condition.
>
> Additionally, the reimbursement process is complex and can involve lengthy delays. While we recognize revenue when healthcare services are provided, there can be delays before we receive payment.  In addition, third-party payors may disallow, in whole or in part, requests for reimbursement based on determinations that certain

amounts are not reimbursable under plan coverage, that services provided were not medically necessary, that services rendered in our facilities did not require emergency level care or that additional supporting documentation is necessary. Retroactive adjustments may change amounts realized from third-party payors. Delays and uncertainties in the reimbursement process may adversely affect accounts receivable, increase the overall costs of collection and cause us to incur additional borrowing costs.

*       *       *

***Failure to timely or accurately bill for our services could have a negative impact on our net revenues, bad debt expense and cash flow.***

Billing for our services is complex.  The practice of providing medical services in advance of payment or prior to assessing a patient's ability to pay for such services may have a significant negative impact on our patient service revenue, bad debt expense and cash flow.  We bill numerous and varied payors, including self-pay patients and various forms of commercial insurance providers.  Different payors typically have differing forms of billing requirements that must be met prior to receiving payment for services rendered.  Self-pay patients and third-party payors may fail to pay for services even if they have been properly billed.  Reimbursement to us is typically conditioned, among other things, on our providing the proper procedure and diagnosis codes.  Incorrect or incomplete documentation and billing information could result in non-payment for services rendered.

Additional factors that could complicate our billing include:

- disputes between payors as to which party is responsible for payment;

- variation in coverage for similar services among various payors;

- the difficulty of adherence to specific compliance requirements, coding and various other procedures mandated by responsible parties;

- the fact that we bill payors a facility fee, a professional services fee and other related fees;

- the transition to new coding standards, which will require significantly more information than the codes currently used for medical coding and will require covered entities to code with much greater detail and specificity; and

- failure to obtain proper physician enrollment and documentation in order to bill various payors.

To the extent the complexity associated with billing for our services causes delays in our cash collections, we assume the financial risk of increased carrying costs associated with the aging of our accounts receivable as well as the increased potential for bad debt expense.

*       *       *

***We are subject to comprehensive and complex laws and rules that govern the manner in which we bill and are paid for our services by third-party payors, and the failure to comply with these rules, or allegations that we have failed to do so, can result in civil or criminal sanctions, including exclusion from federal and state healthcare programs***.

- 15 -

Substantially all of our services are paid for by third-party commercial payors.  These third-party payors typically have differing and complex billing and documentation requirements that we must meet in order to receive payment for our services. Reimbursement is typically conditioned on our providing the correct procedure and diagnostic codes and properly documenting the services themselves, including the level of service provided, the medical necessity for the services, the site of service, and the identity of the physician, nurse or technician who provided the service.

We must also comply with numerous other state and federal laws applicable to our documentation and the claims we submit for payment, including but not limited to (i) "coordination of benefits" rules that dictate which payor we must bill first when a patient has potential coverage from multiple payors, (ii) requirements that we obtain the signature of the patient or patient representative, or, in certain cases, alternative documentation, prior to submitting a claim, (iii) requirements that we make repayment within a specified period of time to any payor which pays us more than the amount to which we are entitled, (iv) "reassignment" rules governing our ability to bill and collect professional fees on behalf of our physicians, (v) requirements that our electronic claims for payment be submitted using certain standardized transaction codes and formats and (vi) laws requiring us to handle all health and financial information of our patients in a manner that complies with specified security and privacy standards.

Private third-party payors carefully audit and monitor our compliance with these and other applicable rules.  Our failure to comply with the billing and other rules applicable to us could result in non-payment for services rendered or refunds of amounts previously paid for such services.

Additionally, on January 16, 2009, the United States Department of Health and Human Services, or HHS, released the final rule mandating that everyone covered by the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996, or HIPAA, which includes our facilities must implement the International Classification of Diseases (10th Edition), or ICD-10, for medical coding on October 1, 2013.   HHS subsequently postponed the deadline for implementation of ICD-10 codes until October 1, 2014, which Congress extended until October 1, 2015, as part of the Protecting Access to Medicare Act of 2014. ICD-10 codes contain significantly more information than the ICD-9 codes currently used for medical coding and will require covered entities to code with much greater detail and specificity than ICD-9 codes.  However, the transition to ICD-10 does not affect Current Procedural Terminology coding for physician services or outpatient procedures.  We may incur additional costs for computer system updates, training, and other resources required to implement these changes.  We may also incur additional costs from further delays in training staff on both the ICD-9 and ICD-10 codes and maintaining software that can operate under both systems through the inherent uncertainty from ongoing delays in ICD-10 implementation.

If our operations are found to be in violation of these or any of the other laws which govern our activities, any resulting penalties, damages, fines or other sanctions could adversely affect our ability to operate our business and our financial results.

[Emphasis in original.]

58.     These risk disclosures were materially inaccurate because the statements did not provide the true risks associated with Adeptus Health's widespread overbilling practices, including

monetary risks, reputational risks, risks associated with improper financial reporting, uncollectible receivables, civil or criminal sanctions, and even exclusion from federal and state healthcare programs.

59.     Further, the Registration Statement failed to disclose known trends, events, and uncertainties that are reasonably likely to have a material effect on the Company's operating results. As noted above, the Registration Statement incorporated by reference the 2014 Form 10-K and the Q1 2015 Form 10-Q.  Item 7 of the 2014 Form 10-K and Item 2 of the Q1 2015 Form 10-Q required the Company to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303].

60.     Item 303(a) of Regulation S-K requires issuers to describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the registrant's liquidity, revenues or income from continuing operations.  In addition, Item 303(a) of Regulation S-K requires that the extent that the financial statements disclose material increases in net revenues, a narrative discussion of the extent to which such increases are attributable to increases in prices or to increases in the volume of services being rendered.

61.     The SEC's interpretive guidance regarding the disclosure required by Item 303(a) of Regulation S-K, provides, in pertinent part, as follows:

> . . . provide insight into material opportunities, challenges and risks, such as those presented by known material trends and uncertainties, on which the company executives are most focused for both the short and long term, as well as the actions they are taking to address these opportunities, challenges and risks.
>
> *          *          *
>
> Identifying the intermediate effects of trends, events, demands, commitments and uncertainties alone, without describing the reasons underlying these effects, may not provide sufficient insight for a reader to see the business through the eyes of management.    A thorough analysis often will involve discussing both the intermediate effects of those matters and the reasons underlying those intermediate effects.  **For example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period**, MD&A should not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the

reasons are also material and determinable. **The analysis should reveal underlying material causes of the matters described**, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.

62.     In violation of these disclosure obligations, the Registration Statement which incorporated by reference the 2014 Form 10-K and the Q1 2015 Form 10-Q failed to disclose: (a) the on-going rate of decline in patient same-store volumes, and (b) the reasons why the Company had been experiencing ballooning rates of same-store revenue growth while its same-store patient volumes were experiencing a steady rate of decline.

63.     Lastly, the information incorporated by reference in the Registration Statement failed to comply with Instruction 11(a) of Form S-3, which required the disclosure of "any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to shareholders and which have not been described in a report on Form 10-Q or Form 8-K filed under the Securities Exchange Act of 1934."

64.     At the time of the filing of this Complaint, Adeptus Health common shares trade at $31.55 per share, approximately 70% below the SPO price of $105 per share.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against Defendant Adeptus Health and the Individual and Underwriter Defendants

65.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

66.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class against all Defendants.

67.     The Registration Statement for the SPO was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made accurate and omitted to state material facts required to be stated therein.

68.     Plaintiff acquired Adeptus Health common shares pursuant to, and in reliance upon, the Registration Statement, without knowledge of the untruths and/or admissions alleged herein.

69.     Defendant Adeptus Health was the registrant for the SPO.  As such, Adeptus Health is strictly liable to the Plaintiff and the Class under Section 11 of the Securities Act for the materially inaccurate statements contained in the Registration Statement and its failure to be complete and accurate.

70.     The Individual Defendants signed the Registration Statement either personally or through an Attorney-in-Fact and caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  The Individual Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact.  As such, the Individual Defendants are liable to Plaintiff and the Class.

71.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement was prepared completely and accurately.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.  As such, the Underwriter Defendants are strictly liable to Plaintiff and the Class.

72.     The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.  None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration

Statement were true and without omissions of any material facts and were not inaccurate.  By reasons of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

73.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of the Class against all Defendants.

75.     Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Registration Statement.  Defendants issued, caused to be issued and/or signed the Registration Statement in connection with the SPO.  The Registration Statement contained a Prospectus that was used to induce investors, such as Plaintiff and the other members of the Class, to purchase the common stock registered in the SPO.

76.     The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not inaccurate, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included participating in the preparation of the false and inaccurate Registration Statement and participating in road shows to market the SPO to investors.

77.     The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus for their own financial benefit.  But for their participation in the SPO, including their solicitation as set forth herein, the SPO could not and would not have been accomplished.  Specifically, the Underwriter Defendants:

(a)     made the decision to underwrite the SPO and do it at the price set forth in the Registration Statement.  The Underwriter Defendants drafted, revised and/or approved the

Registration Statement and participated in its being declared effective by the SEC.  The Prospectus was calculated to create interest in Adeptus Health common stock and was widely distributed by or on behalf of the Underwriter Defendants for that purpose; and

(b)     orchestrated all activities necessary to affect the sale of the common stock in the SPO to the investing public, by common issuing stock, promoting the common stock and supervising its  distribution and ultimate sale to the investing public.

78.     The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included preparing the defective and inaccurate Registration Statement and participating in efforts to market the SPO to investors.

79.     Defendants owed to the purchasers of Adeptus Health common stock, including Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.  Defendants, in the exercise of reasonable care, should have known that the Registration Statement contained misstatements and omissions of material fact.

80.     Plaintiff and the other members of the Class purchased or otherwise acquired Adeptus Health common stock pursuant to the Registration Statement, and neither Plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Registration Statement.

81.     By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff, individually and on behalf of the Class, hereby offers to tender to Defendants those shares of stock that Plaintiff and the other Class members continue to

own, in return for the consideration paid for those shares together with interest thereon.  Class members who have sold their shares are entitled to rescissory damages.

## COUNT III

### Violation of Section 15 of the Securities Act
### Against the Individual Defendants and Defendant Sterling Partners

82.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

83.     This Count is asserted by Plaintiff against all the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. §77o.  For purposes of this Count, Plaintiff does not claim that the Individual Defendants acted with fraudulent intent.

84.     The Individual Defendants and defendant Sterling Partners acted as controlling persons of Adeptus Health within the meaning of Section 15 of the Securities Act.

85.     By reason of their ownership interest, senior management positions and/or directorships at the Company, the Individual Defendants individually, and acting pursuant to a common plan, had the power to influence and exercised the same to cause Adeptus Health to engage in the conduct complained of herein and were therefore control persons of Adeptus Health.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

86.     Defendant Sterling Partners, the Company's "Sponsor" and largest shareholder at the time of the SPO, had the power to influence and exercised the same to cause the Company to engage in the conduct complained of herein and is therefore a control person of Adeptus Health.  By reason of such conduct, defendant Sterling Partners is liable pursuant to Section 15 of the Securities Act.

87.     Each of the Individual Defendants were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed

the SPO to be successfully completed.  Defendant Sterling Partners was a culpable participant in the violations of Section 12(a)(2) of the Securities Act alleged in Count II above, based on its having participated in the process which allowed the SPO to be successfully completed.

## EXCHANGE ACT ALLEGATIONS

88.     For the purposes of this section of the Complaint, the term "Defendants" refers only to defendants Adeptus Health, Hall and Fielding.

89.     The Class Period begins on April 23, 2015.

90.     Before the opening of trading on April 23, 2015, Adeptus Health issued a press release announcing "Net Operating Revenue Increased 110.0% for First Quarter," the quarter ended March 31, 2015.  For the 2015 first quarter, Adeptus Health generated system-wide net patient services revenue of $84.0 million that press release reported was "primarily attributable to the impact of increased patient volumes from the expansion of the number of freestanding facilities from 32 to 62, higher acuity levels, annual gross charge increases and the opening of Dignity Health Arizona General Hospital, a full service general hospital located in Laveen, Arizona."

91.     After the earnings announcement on April 23, 2015, Adeptus Health held a conference call with analysts and investors to discuss the Company's earnings release and operations.  During the conference call, defendant Fielding made misleading statements with respect to Adeptus Health's revenue growth and the reason why same-store revenue was positive even though same-store volumes were negative.  Defendant Fielding stated, in pertinent part, as follows:

> For the first quarter of 2015 Adeptus Health generated net operating revenue of $81.5 million, an increase of 110% from the first quarter of 2014.  The growth was primarily due to higher patient volumes resulting from the increase in the number of free standing facilities, higher acuity levels and annual gross charge increases.  The provision for bad debt was 15.6% of patient service revenue.  Q1 typically has the highest bad debt percentage as health care plans start over and deductibles have not been met.  We estimate full year provision for bad debt to be between 14% and 15%.

> *          *          *

> **Our same store revenue for the quarter based on 24 facilities out of our 63 is 11.3% positive and our same store volume is 10.5% negative**.  What we saw

there, Brooks [Dougherty and Company-Analyst], is we've done a lot of education of folks on the fact that we are not an urgent care, and we continue to do that.  It was interesting.  I actually met someone the other day that was in a different board meeting that spoke up because they were asking, are they just an urgent care?  The person spoke up and said I was in one of their facilities the other day and I heard him tell three different people we are not an urgent care, we are an emergency room.  **We spend a lot of energy on that which affects our volumes.**  Because of that we are seeing the acuity go up.  Our average acuity goes up.  **When your average acuity goes up, your average revenue per patient is going to go up.  With that, hat's [sic] why you see volume is down, but actually same store sales is 11.3% positive.**  As we move into these hospital joint ventures, we anticipate to see the volumes turn the other direction also to be positive.  When we get on-line for example with the Texas hospital, and then when we get the hospitals on-line in Colorado, we expect it to be very positive.

92.     During the conference call, defendant Hall falsely and misleadingly stated that the

Company refers lower acuity patients to urgent care facilities, rather than seeing those patients and

"charge them $1,000, or whatever, and make a lot of money."  Defendant Hall stated, in pertinent

part, as follows:

. . . I talk about this all the time, we spend a lot of energy educating people that we are not an urgent care.  It cost us.  **We could easily see those patients and charge them $1,000, or whatever, and make a lot of money.  But we don't think it is the right thing to do.**  We think it is important that we give the right quality care to the folks that need it, and we have relationships with urgent cares and we actually send people over to them.  What's been interesting is I have run the Company now for three years and three years ago the urgent care's used to really fight with us because they thought we were just trying to steal their patients.  At our board meeting yesterday I actually had marketing show a slide where we are starting to get more referrals from urgent care's.  They've realized **we don't want their patients**, we are not trying to take their patients.  With that, they're starting to send us patients.  I don't think the transparency hurts us at all.  We are already there.  It doesn't hurt others and time will tell.  I think we feel good about it when we get up in the morning how we communicate with people.

93.     In addition, during the conference call, defendant Hall falsely and misleadingly

proclaimed that Adeptus Health provides the highest quality emergency without "charging people

more," stating, in pertinent part, as follows:

Doesn't everybody deserve to have the high quality care?  **We don't charge more.  It is not where we are charging people more.  It is not that at all.  We are just really improving access to the highest quality emergency care**.  As you have seen from our announcement this morning, we are ranked in the top 1% of emergency rooms nationwide.

94.     Defendant Hall also made materially false and misleading statements about patient

satisfaction, stating, in pertinent part, as follows:

- 24 -

As we continue our growth, we are maintaining our unrelenting focus on patient care. **We are ranked among the top 1% of emergency departments nationwide in patient satisfaction**, a testament to the outstanding quality of our team.  Our patient rated our care as top in the nation and it is great to know our team members also rated us as a great place to work.

95.     Following the earnings release and conference call, the price of Adeptus Health common stock soared more than 18%, from $52.15 per share on April 22, 2015 to close at $61.65 per share on April 23, 2015.

96.     On May 1, 2015, Adeptus Health filed the Q1 2015 Form 10-Q with the SEC, which was signed by defendant Fielding.  The Q1 2015 Form 10-Q contained defendants Hall's and Fielding's false and misleading certifications thereon, which stated, in pertinent part, as follows:

I, [Defendants Hall and Fielding], certify that:

1.     I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2015 of Adeptus Health Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

c.     [sic] Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.     [sic] Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

97.     The above certifications by defendants Hall and Fielding were repeated, in all material respects, in the Forms 10-Q that Adeptus Health filed with the SEC throughout the Class Period.

98.     On May 7, 2015, Adeptus Health filed with the SEC the May 2015 Offering prospectus.  The prospectus offered 2.415 million common shares for sale to the public, 1,572,296 common shares by the Company and 842,704 common shares by Sterling Partners.  The May 2015 Offering of common shares was sold pursuant to a materially defective prospectus that failed to disclose material information required to be disclosed pursuant to the regulations governing its preparation and incorporated by reference the Company's materially false and misleading 2014 Form 10-K and the Q1 2015 Form 10-Q.

99.     On May 11, 2015, the Company and Sterling Partners completed the May 2015 Offering.  Adeptus Health sold 1,572,296 common shares to the public at a price of $63.75 per share and received net proceeds of approximately $94.5 million, after deducting underwriting discounts, commissions and offering expenses.  Sterling Partner sold 842,704 common shares to the public at a price of $60.08 per share and received proceeds of approximately $50.6 million.

100.    On July 23, 2015, Adeptus Health issued a press release announcing its financial results for the 2015 second quarter, the period ended June 30, 2015.  For the 2015 second quarter, Adeptus Health reported system-wide net patient services revenue of $104.5 million versus $44.2

million in prior year, an increase of 136%.  The press release also announced that the Company had increased its 2015 full year earnings guidance.

101.    Later that day, Adeptus Health held a conference call with analysts and investors to discuss the Company's earnings release and operations.  During the conference call, defendant Hall once again attributed the increase in the Company's revenue per patient ($1,865 per visit) to higher acuity, stating, in pertinent part, as follows:

> I think when you look at our improvement in the quarter, we had good volumes, we continue to cluster, we had our joint venture now in Colorado.  **And then also which you saw in Q1, was you saw some pricing and pricing was being driven by acuity, change in acuity, as we had a higher acuity level because as we continue to focus on the fact that we're emergency room we're not an urgent care**, we didn't put a lot of energy into that.

102.    Following the issuance of the earnings release and the conference call, the price of Adeptus Health common stock increased more than 20%, from $87.20 per share on July 22, 2015 to close at $105.20 per share on July 23, 2015.

103.    On July 31, 2015, Adeptus Health filed its Form 10-Q for the quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q") with the SEC, which was signed by defendant Fielding.

104.    On July 31, 2015, Adeptus Health also filed the Registration Statement for the SPO with the SEC.  The Registrations Statement failed to disclose material information required to be disclosed pursuant to the regulations governing its preparation and incorporated by reference the Company's materially false and misleading 2014 Form 10-K and the Q1 2015 Form 10-Q.

105.    On October 22, 2015, Adeptus Health issued a press release announcing its financial results for the 2015 third quarter, the period ended September 30, 2015.  For the 2015 third quarter, Adeptus Health reported system-wide net patient services revenue of $109.0 million versus $57.6 million in prior year, an increase of 89%.  The press release also announced that the Company had again increased its 2015 full year earnings guidance.

106.    On October 30, 2015, Adeptus Health filed its Form 10-Q for the quarter ended September 30, 2015 (the "Q3 Form 10-Q") with the SEC, which was signed by defendant Fielding.

107.    The statements referenced above in ¶¶89-93, 95-97, 99-100, and 102-105 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts which were known to Defendants, or recklessly disregarded by them as follows:

(a)    that Adeptus Health has been engaging in widespread predatory billing practices, particularly with respect to low acuity level patients;

(b)    that Adeptus Health's predatory billing practices subjected the Company to numerous known, but undisclosed, risks, including monetary risks, reputational risks, risks associated with improper financial reporting,  civil or criminal sanctions, and even exclusion from federal and state healthcare programs;

(c)    that the Company's financial statements had not been prepared in conformity with GAAP;

(d)    that, contrary to defendant Hall's representations about the Company's practice of referring lower acuity patients to urgent care facilities, Adeptus Health routinely treated low acuity patients and excessively billed them for the services it rendered; and

(e)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about Adeptus Health's then-current business and future financial prospects.

108.    On November 17, 2015, KUSA, an NBC-affiliated television station located in Denver, Colorado, aired a *9WANTS To Know* investigative report about the billing practices at Adeptus Health's Colorado First Choice ERs.  According to the report, which had been based on "months" of investigation, the Company's First Choice ERs engaged in a pattern and practice of predatory overbilling.

109.    In response to the airing of the KUSA investigative report, the price of Adeptus Health common stock plummeted more than 22% on very heavy trading volume falling from $59.87 per share on November 16, 2015 to $46.50 per share on November 17, 2015.

110.    The market for Adeptus Health common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false and misleading statements and omissions alleged herein, Adeptus Health common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Adeptus Health common stock relying upon the integrity of the market price of Adeptus Health common stock and market information relating to Adeptus Health, and have been damaged thereby.

111.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Adeptus Health common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

112.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Adeptus Health operations, acquisitions and future financial prospects.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Adeptus Health common stock and its business, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other

members of the Class purchasing the Company's shares at artificially inflated prices, thus causing

the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

113.    For the purposes of this section of the Complaint, the term "Defendants" refers only

to defendants Adeptus Health, Hall and Fielding.

114.    As alleged herein, Defendants acted with scienter in that Defendants knew, or

recklessly disregarded, that the public documents and statements they issued and disseminated to the

investing public in the name of the Company, or in their own name during the Class Period, were

materially false and misleading.  Defendants knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements and documents as primary violations of the

federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts

regarding Adeptus Health, their control over, and/or receipt and/or modification of Adeptus Health's

allegedly materially misleading misstatements, were active and culpable participants in the

fraudulent scheme alleged herein.

115.    Defendants knew and/or recklessly disregarded the false and misleading nature of the

information that they caused to be disseminated to the investing public.  The fraudulent scheme

described herein could not have been perpetrated during the Class Period without the knowledge and

complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company,

including defendants Hall and Fielding.

116.    Defendants Hall and Fielding, because of their positions with Adeptus Health,

controlled the contents of Adeptus Health's public statements during the Class Period.  Defendants

Hall and Fielding were each provided with or had access to the information alleged herein to be false

and/or misleading prior to or shortly after their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected.  Because of their positions and access to

material non-public information, defendants Hall and Fielding knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the Defendants is responsible for the accuracy of Adeptus Health's corporate statements and are, therefore, responsible and liable for the representations contained therein.

117.    In addition, the scienter of the Defendants is underscored by the Sarbanes-Oxley mandated certifications of defendants Hall and Fielding, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Adeptus Health was made known to them and that the Company's disclosure related controls were operating effectively.

118.    Defendants were also motivated to engage in this course of conduct to allow the Company and Company insiders to sell more ***one-half billion dollars*** of Adeptus Health common shares at inflated prices.

119.    As noted herein, during the Class Period, Adeptus Health sold 4.2 million shares in two public offerings for net proceeds of approximately ***$360 million***.  In addition, Sterling Partners, the Company's "Sponsor" and largest beneficial owner of Adeptus Health common shares during the Class Period, sold more than ***50%*** of its common stock holdings in the Company to the public at artificially inflated prices in two public offerings during the Class Period, including the SPO, for net proceeds of approximately ***$178 million***.

## LOSS CAUSATION

120.    For the purposes of this section of the Complaint, the term "Defendants" refers only to defendants Adeptus Health, Hall and Fielding.

121.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Adeptus Health

common stock and operated as a fraud or deceit on Class Period purchasers of Adeptus Health common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Adeptus Health common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

122.    As a result of their purchases of Adeptus Health common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Adeptus Health common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $121.76 per share on September 18, 2015.

123.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Adeptus Health's business, risks and future financial prospects.  When the truth about the Company was revealed to the market, the price of Adeptus Health common stock fell significantly removing the inflation therefrom, causing real economic loss to investors who had purchased Adeptus Health common stock during the Class Period.

124.    The decline in the price of Adeptus Health common stock after the corrective disclosure came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in Adeptus Health common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

125.    The economic loss*, i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Adeptus Health common stock and the subsequent significant declines in the value of Adeptus Health

common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

126.    At all relevant times, the market for Adeptus Health common stock was an efficient market for the following reasons, among others:

(a)    Adeptus Health common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)    as a regulated issuer, Adeptus Health filed periodic public reports with the SEC and the NYSE;

(c)    Adeptus Health regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Adeptus Health was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

127.    As a result of the foregoing, the market for Adeptus Health common stock promptly digested current information regarding Adeptus Health from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Adeptus Health common stock during the Class Period suffered similar injury through their purchase of Adeptus Health common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

128.    For the purposes of this section of the Complaint, the term "Defendants" refers only to defendants Adeptus Hall and Fielding.

129.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements plead herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements plead herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Adeptus Health who knew that those statements were false when made.

**COUNT IV**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against Defendants Adeptus Health, Hall and Fielding**

130.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

131.    During the Class Period, defendants Adeptus Health, Hall and Fielding disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

132.    Defendants Adeptus Health, Hall and Fielding violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon the Plaintiff and others similarly situated in connection with their purchases of Adeptus Health common stock during the Class Period.

133.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Adeptus Health common stock.  Plaintiff and the Class would not have purchased Adeptus Health common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

134.    As a direct and proximate result of these Defendants' wrongful conduct, the Plaintiff and the other members of the Class suffered damages in connection with their purchases of Adeptus Health common stock during the Class Period.

### COUNT V

**Violation of Section 20(a) of the Exchange Act
Against Defendants Hall and Fielding**

135.    Plaintiffs repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

136.    Defendants Hall and Fielding acted as controlling persons of Adeptus Health within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Adeptus Health, defendants Hall and Fielding had the power and authority to cause

Adeptus Health and its employees to engage in the wrongful conduct complained of herein. Adeptus Health controlled each of the Count V Defendants and all of its employees. By reason of such conduct, the Count V Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, on behalf of himself and the Class, pray for judgment as follows:

A.      Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.      Awarding the Plaintiff and other members of the Class damages together with interest thereon;

C.      With respect to Count II, ordering that the SPO be rescinded;

D.      Awarding the Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.      Awarding the Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  October 27, 2016

  /s/ Samuel H. Rudman by permission Claire Henry

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN – LEAD ATTORNEY
State Bar No. SR7957
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

T. John Ward, Jr.
Texas Bar No. 00794818
jw@wsfirm.com
Claire Abernathy Henry
Texas Bar No. 24053063
claire@wsfirm.com
Andrea L. Fair
Texas Bar No. 24078488
andrea@wsfirm.com
**WARD, SMITH & HILL, PLLC**
PO Box 1231
Longview, TX 75606-1231
Telephone: (903) 757-6400
Facsimile: (903) 757-2323

*Attorneys for Plaintiff*